J-A29025-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| THOMAS M. HOOVER, JR. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES AND KIM LEWIS | : | |
| | : | |
| v. | : | No. 812 WDA 2023 |
| | : | |
| LISA K. COHEN | : | |
| | : | |
| Appellant | : | |

Appeal from the Order Entered June 7, 2023
In the Court of Common Pleas of Blair County Civil Division at No(s):
No. 2011  254

BEFORE:  BOWES, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY KUNSELMAN, J.:                **FILED: APRIL 26, 2024**

In this dispute between grandparents, Appellant Lisa Cohen (Paternal Grandmother) appeals the decision of the Blair County Court of Common Pleas, which awarded Appellees James and Kim Lewis (Maternal Grandparents) primary physical custody and shared legal custody of their 13-year-old grandson, A.J.L. (the Child). Paternal Grandmother was awarded partial physical custody, but she previously exercised nearly sole custody. Appellee Thomas M. Hoover, Jr. (Father), whose involvement in the Child's life has been minimal, was awarded partial physical custody and shared legal custody; Father does not appeal, nor did he submit an appellate brief.  Alicia

Lewis (Mother) is deceased.[1] Paternal Grandmother argues that Maternal Grandparents lacked standing – specifically, that they did not file their action within the requisite timeframe under the Child Custody Act. *See* 23 Pa.C.S.A. § 5324(3)(iii)(C). After careful review, we agree. Therefore, we reverse the trial court's award and remand for further proceedings.

The record discloses the following history. The Child was born in 2010 while Mother and Father were still teenagers. Father did not initially acknowledge paternity, and the relationship between the families was antagonistic. Father filed an action in 2011 resulting in an award of partial custody, which he did not exercise consistently.

Between 2010 and 2015, Child and Mother resided in Maternal Grandparents' home. In 2015, Mother married William Smith (Stepfather).[2] Mother and the Child then moved out of the Maternal Grandparents' home to live with Stepfather, but they soon returned to live in a doublewide trailer-home located on Maternal Grandparents' property. The trailer-home was in the Maternal Grandparents' backyard, but it had a separate street address. Although the Child no longer lived in Maternal Grandparents' house, he had a

---

[1] We have modified the caption by removing Mother and adding Maternal Grandparents to reflect the current parties to the litigation.

[2] For short reference, we refer to Mr. Smith as "Stepfather." We clarify that Stepfather never adopted the Child, though there had allegedly been some discussion to that effect. Stepfather was present for these proceedings as a fact-witness, but he did not seek custody of the Child. We note further that Stepfather is the parent of two daughters he shared with Mother. The Child testified that he had a good relationship with Stepfather and his half-sisters.

bedroom there, and he often slept over. Maternal Grandparents were involved in the Child's life on a near-daily basis until 2020. They often cooked for him, bathed him, and saw him off to school.

Mother and Father engaged in more custody litigation between 2016 and 2017. Mother was again awarded primary physical custody subject to Father's partial custody. Father's exercise of custody continued to be sporadic. Although Paternal Grandmother and Shawn Cohen (Paternal Grandfather) had a good relationship with the Child, Father's involvement was minimal.[3]

In May 2020, Mother separated from Stepfather. She and the Child left the trailer-home and moved to live near Paternal Grandparents, approximately 30 minutes away. According to Maternal Grandparents, Mother left, because they sought to get her help for her suicidal ideations.

At this juncture, the procedural history of this custody case became incredibly convoluted. In July 2020, Maternal Grandparents filed a petition to intervene in the custody case between Mother and Father. Initially, Maternal Grandparents requested "emergency shared legal and physical custody" to "ensure the child's attendance at counseling, medication, appointments, and school." *See* Petition to Intervene/Emergency Custody, filed 7/9/2020, at

---

[3] At the time of these proceedings, Father was married (but separated) and had three additional children.

¶15.[4]  Given the urgent nature of the pleading and the COVID-19 pandemic, the trial court conducted a brief video conference, prior to its evidentiary hearing, with all parties able to participate.  At the video conference, Maternal Grandparents clarified that they sought only partial physical custody.  ***See*** Order of Court, 8/13/2020 ("If th[e] petition is granted, [counsel for Maternal Grandparents] indicated on behalf of her clients that they will be asking for some immediate ***partial*** custody rights.") (emphasis added).

Less than two weeks later, on August 24, 2020, Mother and Father signed a consent agreement granting Paternal Grandmother shared physical and legal custody.  Maternal Grandparents were not made aware of this agreement for some time.  The August 2020 consent order provided no periods of physical custody to Father, except during holidays.

In October 2020, upon Mother's request, the trial court continued the hearing on Maternal Grandparents' petition to intervene.  Meanwhile, Maternal Grandparents learned of the August 2020 consent order.  Maternal Grandparents then filed a "motion for guardian *ad litem*/standing/conflict." Therein, Maternal Grandparents alleged that Mother had limited their contact with the Child, and they raised three challenges.  First, Maternal Grandparents sought to have the Child appointed a guardian *ad litem*.  Second, they claimed that Paternal Grandparents lacked standing to be involved in Maternal

---

[4] The petition did not include an averment as to which statutory basis they sought to intervene, but we note that Maternal Grandparents alleged they stood *in loco parentis.* ***Id.***

Grandparents' bid to intervene in Mother and Father's custody case; Maternal Grandparents did not allege facts to support their own standing to seek custody. Third, they raised the potential conflict between the court and Shawn Cohen (Paternal Grandfather), a local attorney.[5] The court scheduled the motion for a hearing.

Between October 2020 and April 2021, the litigation was delayed for various reasons. Mother and Maternal Grandparents both changed attorneys (although Mother eventually proceeded *pro se*). The parties questioned who should be given notice of the pleadings. In December 2020, the trial judge recused himself due to Paternal Grandfather's involvement in the local bar association. The recusal meant that the matter had to be set before an out-of-county judge.

After several months in limbo, on April 5, 2021, Mother filed for custody modification against Paternal Grandmother. Mother requested the Child be returned to her sole custody. Mother alleged that the Child had not done well in the Paternal Grandparents' school district; that the Paternal Grandparents had pressured the Child about his studies; that Paternal Grandmother had denied Mother access to the Child and was overly critical of Mother; and that the Child was depressed. When Mother filed her April 2021 modification petition, Maternal Grandparents' July 2020 action for partial custody was still

---

[5] Paternal Grandfather was a quasi-participant in these proceedings. As a step-grandparent, he did not seek to intervene. As an attorney, he did not seek to represent Paternal Grandmother in an official capacity, but the trial court permitted him to "assist" his wife. **See** N.T., 5/14/21 at 74.

pending as was their October 2020 request for the appointment of the guardian *ad litem*. And then the character of this case drastically changed.

On April 30, 2021, Mother committed suicide. On May 11, 2021, Maternal Grandparents filed a "complaint for modification of custody." Critically, Maternal Grandparents sought custody under new grounds. For the first time, they alleged that had standing to seek primary physical custody and legal custody under 23 Pa.C.S.A. § 5324; alternatively, they alleged standing to seek partial physical custody under 23 Pa.C.S.A. § 5325(1) (pertaining to the death of a parent). **See** Maternal Grandparents' Complaint for Modification of Custody, dated 5/11/21, at ¶¶ 18, 19.[6]

On May 14, 2021, the Maternal Grandparents, the Paternal Grandmother, and Father appeared before the court. Paternal Grandmother appeared *pro se*, but the court permitted Paternal Grandfather to assist in her self-representation. Ostensibly, the hearing was on Maternal Grandparents' "petition for standing/petition for guardian *ad litem*/petition to intervene," according to the title on the transcript of those proceedings. Unfortunately, the trial court did not resolve the discrepancies in the procedural posture of the case before testimony began. In the view of Father's attorney, the official

---

[6] It seems that by filing the May 2021 complaint, Maternal Grandparents intended to abandon the July 2020 petition to intervene. For one, the May 2021 complaint alleged that Maternal Grandparents "do not have information of a custody proceeding concerning the Child pending in a court of this Commonwealth." **See id.** at ¶ 14. And it appeared that the complaint had been in the works following Mother's April 5, 2021 filing, prior to her death, because the verifications were signed April 28, 2021, two days before Mother's death.

business before the court on May 14, 2021 was twofold: 1) Maternal Grandparents' July 2020 petition to intervene for partial custody; and 2) the October 2020 petition for the appointment a guardian *ad litem*. **See** N.T., 5/14/21, at 1-2. Counsel for Maternal Grandparents said that the matter concerned standing, the appointment of a guardian *ad litem*, "as well as a custody schedule for all parties involved." **Id.** at 2. It became apparent, however, that Maternal Grandparents wanted to treat their earlier July 2020 petition to intervene as the vehicle to preserve, as timely, their May 2021 action for primary custody. There was no mention of the Maternal Grandparents' May 2021 complaint, wherein they alleged standing for primary custody and a new basis for partial custody. The court simply said it hoped to have "an interim custody order so that we can see where we are relative to maybe a further full-time custody situation." **See** N.T., 5/14/21, at 3. Counsel for Maternal Grandparents then called the first witness.

Starting with the May 2021 hearing, the trial court conducted four days of proceedings over the course of two years. On the first day, the trial court conducted an *in camera* interview of the Child and Maternal Grandmother testified. The trial court then issued an interim order granting shared physical custody and shared legal custody to Maternal Grandparents for the rest of the summer. The order was silent on standing. [7]

---

[7] At this point, it appears the trial court included Paternal Grandfather in its custody order and considered him to be a party, even though he never formally intervened. No one challenged his inclusion in the order.

On August 3, 2021, the hearing resumed where it left off three months prior. The transcript labeled this proceeding as a "custody evidentiary hearing," but there was no mention of whether the hearing was meant to address either the July 2020 action for partial custody or the May 2021 action for primary custody. In any event, the trial court heard additional testimony from Paternal Aunt, Maternal Grandfather, Father, and Stepfather. At the end of the testimony, with the case still incomplete, the court issued a second interim order. *See* Second Interim Order of Court, dated 8/6/21.

The second interim order was designed to last through the 2021-2022 school year, if need be. *See id.*; *see also* N.T., 8/3/21 at 229-230. The court increased the Maternal Grandparents' physical custody from shared to primary, so that the Child could return to the school district where he had been enrolled until 2020. The order provided that only Maternal Grandparents and Father would share legal custody. Paternal Grandparents received partial physical custody every Tuesday and Thursday evening and one weekend per month. The second interim order provided that the next hearing date would be scheduled by separate order.

In September 2021, Father (through counsel) and Paternal Grandmother (*pro se*) petitioned the trial court to vacate the second interim order. Until then, the court had yet to deprive Paternal Grandmother of primary physical custody or legal custody. Evidently, it became apparent to Father and Paternal Grandmother that the trial court meant to resolve not just Maternal Grandparents' July 2020 petition, but also their May 2021 complaint

for primary and legal custody. Father and Paternal Grandmother reiterated that Maternal Grandparents lacked standing under 23 Pa.C.S.A. § 5324. The trial court did not rule on these petitions until the hearing resumed 10 months later, in July 2022.[8]

On July 21, 2022, the hearing began with a discussion about the petitions to vacate the second interim order, which as far as we can tell, had been pending since the previous September. Father and Paternal Grandmother maintained that Maternal Grandparents lacked standing to seek primary custody under 23 Pa.C.S.A. § 5324. *See generally* N.T., 7/21/23, at 1-5. Maternal Grandparents countered that they stood *in loco parentis* under Section 5324(2); alternatively, that they had standing under Section 5324(3)(iii)(C), alleging that the Child lived with them for 12 consecutive months and that they their action was timely. *Id.* at 6-7. The court ruled that Maternal Grandparents had standing under "524(2) or (3)," and then the court proceeded with testimony. *Id.* at 7.

The trial court heard additional testimony from Paternal Grandparents, Father, and Maternal Grandmother. At the conclusion of this testimony, the court prepared to issue its final order and asked the litigants to file respective

---

[8] It does not appear that trial court originally intended for its August 2021 interim order to last the entire school year. The record suggests that the court hoped the next hearing would occur sometime in Fall 2021. However, Paternal Grandmother then hired counsel, and counsel's unavailability necessitated several continuances. We note further that between the August 2021 proceeding and the July 2022 proceeding, the trial court had appointed the Child a guardian *ad litem* – specifically, on October 26, 2021.

proposed findings and a proposed custody order by August 15, 2022. In the meantime, the court issued another interim order, dated July 22, 2022, setting forth the rest of the summer schedule. Maternal Grandparents' proposal was docketed on August 22, 2022. Paternal Grandmother did not submit a proposal but instead appealed the denial of her request to vacate the interim orders.

While Paternal Grandmother's appeal was pending, the trial court decided not to issue a final custody order, even though the court apparently recognized that it retained jurisdiction to do so.[9] Instead, the court issued yet another interim custody order, dated August 26, 2022, meant to last the entire 2022-2023 school year. This Court quashed Paternal Grandmother's appeal as interlocutory in October 2022. The trial court took no further action for another six months, until it conducted a "status conference" on May 23, 2023.

At the status conference, the trial court learned that the Child had been buckling under the weight of the litigation and in the aftermath of Mother's death. There was a pending truancy matter, the Child had since enrolled in cyber school, and he might be held back a grade. Father did not appear at the status conference. Both sets of Grandparents, each represented by substitute counsel, traded blame and accusations. There had been just one

---

[9] The trial court issued a "Notice of Intention to Proceed Pursuant to Pa.R.A.P. 1701(b)(6)" on August 26, 2022. Rule 1701(b)(6) provides a trial court with the authority to "[p]roceed in a matter in which a non-appealable interlocutory order has been entered, notwithstanding the filing of a notice of appeal or a petition for review of the order."

visit between the Child and the Paternal Grandparents for the last 8 months, dating back to September 2022. There was doubt as to whether the recommendation of the guardian *ad litem* was valid, given his failure to interview the Paternal Grandparents. Even the trial court recognized that the record had gone stale, that a final custody order had to be issued so that the litigants could either appeal or initiate modification proceedings. ***See generally*** N.T., 5/23/23, at 1-37.

The court ultimately issued its final custody order and memorandum opinion on June 7, 2023 – two years after the first date of the evidentiary hearing. In its memorandum opinion, the trial court determined that Maternal Grandparents had standing for any form of custody, even as the court acknowledged that they did not meet the technical requirements under 23 Pa.C.S.A. § 5324.[10] The trial court awarded Maternal Grandparents primary

---

[10] The trial court's memorandum opinion did not formally identify which statutory basis it found standing, but it noted that Maternal Grandparents alleged standing under Section 5324(3)(iii)(C) in their May 2021 complaint. The court then conceded that Maternal Grandparents did not file an action within the requisite six-month timeframe:

> While the calendar may show a period of greater than six months existed prior to the Maternal Grandparents having taken the legal action of filing for a modification of custody, it is apparent that they acted promptly upon learning of the custody consent order [with the Paternal Grandparents, dated August 2020] and their ongoing concern for their daughter's mental health. We conclude that the Maternal Grandparents enjoy standing for all manner of custodial relationships to the Child.

*(Footnote Continued Next Page)*

physical custody and shared legal custody. The court awarded Paternal Grandparents partial physical custody, which they could exercise on the fourth full weekend of each month. The court awarded Father shared legal custody and partial physical custody every Tuesday and Thursday evening, and the second full weekend of each month; but the order provided Paternal Grandparents the ability to assume Father's custody time if he chose not to exercise it. During the summer, the Maternal and Paternal Grandparents would share physical custody.

Paternal Grandmother timely filed a notice of appeal. She presents the following four issues, which we have reordered for ease of disposition:

1. Did the trial court err and/or abuse its discretion by entering an order granting Maternal Grandparents standing for primary physical custody against the standards set forth in 23 Pa.C.S.A. § 5324?

2. Did the trial court err and/or abuse its discretion by failing to enter a final appealable order within the time required by Pa.R.C.P. 1915.4?

3. Did the trial court err and/or abuse its discretion by entering a custody order ten months after the last hearing, on a stale and outdated record?

4. Did the trial court err and/or abuse its discretion by entering an order in custody that was not in the best interests of the Child?

Paternal Grandmother's Brief at 7.

---

Memorandum Opinion, 6/7/23, at *10 (not paginated) (style adjusted).

The trial court made no reference to Section 5324(2)(relating to *in loco parentis* standing) or Section 5324(3)(iii)(B)(relating to parental neglect).

We begin our discussion by acknowledging the appropriate scope and standard of review. Threshold issues of standing are questions of law; thus, our standard of review is *de novo* and our scope of review is plenary. ***Raymond v. Raymond***, 279 A.3d 620, 627 (Pa. Super. 2022) (citations omitted).

Parents have a fundamental right to make decisions concerning the care, custody, and control of their children; that right is protected by the Fourteenth Amendment's due process and equal protection guarantees. ***See, e.g., D.P. v. G.J.P.***, 146 A.3d 204, 210 (Pa. 2016) (citing ***Troxel v. Granville***, 530 U.S. 57, 65 (2000) (plurality)); ***see also*** U.S. Const. amend. XIV, § 1. Under the Child Custody Act, and in accordance with those constitutional protections, only certain individuals may petition for custody of another's child. Generally, the law does not permit third parties to seek custody of a child contrary to the wishes of that child's parents, as this constitutes an infringement of the parent's constitutional rights. ***Wilson v. Smyers***, 284 A.3d 509, 516 (Pa. Super. 2022).

The Act provides several exceptions to this rule, which apply primarily to grandparents and great-grandparents. ***Raymond***, 279 A.3d at 627; ***see also*** 23 Pa.C.S.A. §§ 5324-5325. Underpinning those statutory exceptions is the state's interest in protecting the health and emotional welfare of children, which includes ensuring that children are not deprived of beneficial relationships with their grandparents. ***Wilson***, 284 A.3d at 516 (citing ***Hiller v. Fausey***, 904 A.2d 875, 886 (Pa. 2006) and ***D.P.***, 146 A.3d at 211).

- 13 -

In July 2020, Maternal Grandparents petitioned to intervene so they could obtain emergency custody of the Child. At the video conference, Maternal Grandparents clarified that they sought only partial physical custody of the Child. The Act defines partial physical custody as the right to assume physical possession and control of the child for less than a majority of the time. *See* 23 Pa.C.S.A. § 5322 (Definitions). Section 5325 provides three separate bases to grant a grandparent standing to seek partial custody. *See* § 5325(1)-(3). Whether Maternal Grandparents could have established standing for partial physical custody under Section 5325(2) or (3) became a moot point following Mother's death in April 2021.

In May 2021, Maternal Grandparents filed a new complaint for custody, alleging standing under Section 5325(1). Under that subsection, when a parent of a child dies, the grandparent (that is, the parent of the deceased parent) may file an action for partial physical custody. *See* § 5325(1). There is no question Maternal Grandparents have standing under this subsection.

Also in their May 2021 complaint, Maternal Grandparents requested primary physical custody and legal custody of the Child under Section 5324(3)(iii)(C). "Primary physical custody" is the right to assume physical possession and control of the child for the majority of the time. *Id.* "Legal custody" is the "right to make major decisions on behalf of the child, including, but not limited to, medical, religious and educational decisions." *Id.* Section 5324 of the Child Custody Act authorizes who may file an action for primary physical and legal custody:

- 14 -

The following individuals may file an action under this chapter for any form of physical custody or legal custody:

(1) A parent of the child.

(2) A person who stands in loco parentis to the child.

(3) A grandparent of the child who is not in loco parentis to the child:

> (i) whose relationship with the child began either with the consent of a parent of the child or under a court order;
>
> (ii) who assumes or is willing to assume responsibility for the child; and
>
> (iii) when one of the following conditions is met:
>
> > (A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters);
> >
> > (B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or
> >
> > ***(C) the child has, for a period of at least 12 consecutive months, resided with the grandparent,*** excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be ***filed within six months after the removal of the child from the home.***

(4) Subject to paragraph (5), an individual who establishes by clear and convincing evidence all of the following:

> (i) The individual has assumed or is willing to assume responsibility for the child.
>
> (ii) The individual has a sustained, substantial and sincere interest in the welfare of the child. In determining whether the individual meets the requirements of this subparagraph, the court may consider, among other factors, the nature, quality,

- 15 -

extent and length of the involvement by the individual in the child's life.

(iii) Neither parent has any form of care and control of the child.

(5) Paragraph (4) shall not apply if:

(i) a dependency proceeding involving the child has been initiated or is ongoing; or

(ii) there is an order of permanent legal custody under 42 PA.C.S. § 6351(a)(2.1) or (f.1)(3)(relating to disposition of dependent child).

23 Pa.C.S.A. § 5324 (emphasis added).

Section 5324 provides four avenues to custody. Obviously, Maternal Grandparents are not natural parents and thus do not qualify under Section 5324(1). Maternal Grandparents also do not stand *in loco parentis* under Section 5324(2); Father – and Mother before him – objected to Maternal Grandparents' involvement.[11] Section 5324(4) was not available to Maternal Grandparents, either. In its final custody order, the court awarded Father partial physical custody and legal custody. Thus, it cannot be said that

_____

[11] A third-party cannot place themselves *in loco parentis* in defiance of the parents' wishes and the parent/child relationship. **See, e.g., T.B. v. L.R.M.**, 786 A.2d 913, 917 (Pa. 2001). For this reason, Paternal Grandparents stand *in loco parentis* where Maternal Grandparents do not.

We note further that the trial court did not find that Maternal Grandparents stood *in loco parentis* in its ultimate order, notwithstanding its ruling during the third day of testimony. Similarly, Maternal Grandparents did not aver they stood in *loco parentis* in their May 2021 complaint, notwithstanding the averments in their July 2020 petition. Finally, we note that Maternal Grandparents do not aver in their Appellee Brief that *in loco parentis* standing would be a proper basis to affirm in the trial court's order.

- 16 -

"neither parent has any form of care and control of the child," which is a necessary precondition to standing under Section 5324(4)(iii).

This case concerns whether Maternal Grandparents qualified under Section 5324(3). Indisputably, Maternal Grandparents are grandparents, whose relationship began with the consent of a parent, and they are willing to assume responsibility for the Child. **See** 23 Pa.C.S.A. § 5324(3)(i)-(ii). But Maternal Grandparents had to meet one of the three additional conditions listed in Section 5324(3)(iii)(A)-(C).

Subsection (A) is inapplicable because the Child was never adjudicated dependent under the Juvenile Act. Subsection (B) does not apply either. That subsection provides standing where the Child is "substantially at risk to due parental abuse, neglect, drug or alcohol abuse or incapacity." **See** § 5324(3)(iii)(B).

As applied here, Maternal Grandparents would only qualify if Father's absence from the Child's life constituted neglect, and if that neglect put the Child at risk. We note that the trial court addressed Father's ambivalence toward these proceedings and toward the Child. "[I]n some respects it would appear that Father had no relationship with the Child but for the involvement of his parents during their periods of custody." **See** Memorandum Opinion, 6/7/23, at *11; **see also** N.T., 8/3/21, at 228-229; **and see** N.T., 5/23/23, at 12-13. Paternal Grandparents have defended Father as a parent who has been repeatedly let down by the judicial system. **See** N.T., 5/23/23 at 11. Although Father has allowed his negative opinion of the judicial system to

- 17 -

interfere with his relationship with the Child, his ambivalence does not constitute neglect, because the Child was never put at risk. While Father was content to let others raise the Child, he at least ensured the Child's safety. This was evinced by his and Mother's decision to grant Paternal Grandmother shared physical and legal custody in August 2020. For these reasons, Maternal Grandparents cannot establish standing under Section 5324(3)(iii)(B).

Ultimately, this case turns on Section 5324(3)(iii)(C). Under this subsection, Maternal Grandparents had to prove that the Child resided with them for at least 12 consecutive months before Mother removed the Child from the home; additionally, Maternal Grandparents also had to show they filed their action within six months of that removal. **See** § 5324(3)(iii)(C). Upon review, we must resolve **when** the Child resided with Maternal Grandparents and **when** Maternal Grandparents filed their action for primary/legal custody under Section 5324(3)(iii)(C).

Assuming the clock began when Mother and the Child moved in May 2020, Maternal Grandparents would have had to file an action for primary and/or legal custody by November 2020. They did not. They only filed under that ground, and for that type of action, when they brought their complaint in May 2021 – one year after the Child's removal and six months too late.

Maternal Grandparents maintain that they satisfied the six-month filing requirement when they filed their July 2020 "Petition to Intervene/Emergency Custody." We recognize that Maternal Grandparents averred in that pleading

they stood *in loco parentis*; and we further note that they requested "emergency shared legal and physical custody of the Child." *See* Maternal Grandparents' Petition to Intervene/Emergency Custody, 7/9/21 at ¶15. Although they did not specify a statutory basis in their petition, the pleading at least suggested standing for any form of custody under Section 5324(2). Perhaps this would have sufficed. But at the ensuing video conference, Maternal Grandparents clarified that they were seeking only "immediate partial custody rights." *See* Order of Court, 8/13/20.

Moreover, Maternal Grandparents then abandoned their July 2020 petition when they filed their May 2021 complaint. First, they alleged in the May 2021 complaint that no other custody action was pending. *See* Maternal Grandparents Complaint for Custody Modification at ¶14. Second, Maternal Grandparents alleged new – and different – grounds for standing. They asserted standing under Section 5324(3)(iii)(C), but not under subsection (2) (relating to *in loco parentis* status); and they asserted standing for partial custody under Section 5325(1) (pertaining to the death of a parent), but not any other ground under Section 5325(2) or (3). *See id.* at ¶¶ 18, 19.

Had the trial court conducted an evidentiary hearing on Maternal Grandparents' July 2020 action for partial custody, prior to Mother's death, Maternal Grandparents would have likely satisfied Section 5325(3), which

contains nearly identical language to Section 5324(3)(iii)(C).[12] Following Mother's death, Maternal Grandparent's qualified for partial custody under Section 5325(1). However, an action for partial custody is categorically different than an action for primary custody or legal custody. We conclude that Maternal Grandparents' action for partial custody under Section 5325 did not toll the timeframe for a primary or legal custody action under Section 5324(3)(iii)(C).

We are unpersuaded by the trial court's rationale for similar reasons. The court conceded that Maternal Grandparents' action was untimely, but it opined that standing was proper because Maternal Grandparents "acted promptly upon learning of the custody consent order" between Mother, Father, and Paternal Grandmother in August 2020. **See** Memorandum Opinion, 6/7/23 at *10 (not paginated). The trial court was referring to Maternal Grandparents' "motion for standing/guardian ad litem/conflict," which they filed in October 2020, soon after they learned about the consent agreement.

Had this October 2020 pleading indicated that Maternal Grandparents sought primary and/or legal custody under Section 5324, then they might have been within the six-month timeframe. But the title of the pleading

---

[12] Section 5325(3) provides standing to grandparents "when the child has, for a period of at least 12 consecutive months, resided with the grandparent[…], excluding brief temporary absences of the child from the home, and is removed from the home by the parents, an action must be filed within six months after the removal of the child from the home. **See** 23 Pa.C.S.A. § 5325(3).

included a misnomer; Maternal Grandparents did not allege standing in that motion. The standing component challenged **_Paternal Grandmother's_** involvement; the pleading did not establish their own standing. Maternal Grandparents had argued that Paternal Grandmother should not be a party to their July 2020 action to intervene for partial custody.[13] How Paternal Grandmother was involved in this case, when Maternal Grandparents learned about it, and what Maternal Parents did about it, are irrelevant to the standing analysis under Section 5324(3)(iii)(C). Because the October 2020 pleading was silent to Maternal Grandparents' standing under Section 5324, we cannot hold that the six-month timeframe was tolled before it expired.

Importantly, Maternal Grandparents' do not satisfy Section 5324(3)(iii)(C) for another reason. Subsection (C) also requires the child to reside with the grandparent for 12 consecutive months prior to the removal of the child by the parent. At that point, the six-month filing requirement begins to run. Thus far, our construction of the statutory timeline under Section 5324(3)(iii)(C) has been based on the assumption that the Child had resided with the Maternal Grandparents until May 2020. However, the record demonstrates that the Child lived separately from Maternal Grandparents from approximately 2015 onward.

---

[13] Maternal Grandparents argued Paternal Grandmother lacked standing, notwithstanding the August 2020 consent agreement granting her custody rights. Maternal Grandparents suggested that the consent agreement was invalid, that Mother only signed it because she was in a fragile mental state and succumbed to Paternal Grandparents' undue influence.

To explain: between 2010 and 2015, the Child and Mother did reside with Maternal Grandparents, in their house. But following Mother's marriage to Stepfather in 2015, Mother and the Child moved out. Mother, the Child, and Stepfather briefly lived in another location, before they moved into a doublewide trailer-home immediately behind the Maternal Grandparents house, in their backyard. From 2015 to 2020, the Child lived in the trailer-home with Mother, and Stepfather (and eventually his two sisters). Of course, he saw Maternal Grandparents practically daily. Maternal Grandmother often cooked for the Child, helped him with his homework, and saw him off to school. Maternal Grandmother also testified that they kept a bedroom for the Child in the house, and that he would sometimes stay over.

Notwithstanding the proximity of the dwellings, and notwithstanding ownership, we conclude that the trailer-home and the single-family house were separate residences for purposes of Section 5324(3)(iii)(C). Not only did the residences have separate street addresses, but perhaps more importantly, the family considered these homes to be separate. During cross-examination, Maternal Grandmother conceded as much:

| Father's Counsel: | Now, would you also agree that prior to the filing of this petition, July 9, 2020, would you agree for the year previous to that date, your daughter, [Mother], actually did not live with you, right? |
| --- | --- |
| Maternal Grandmother: | No, she lived in the backyard in the double-wide [trailer-home]. |

| | |
|---|---|
| Father's Counsel: | Okay. Just so we're clear, I understand and I don't know whether this is all in one deed – I don't think it matters – but these are two separate residences, right? |
| Maternal Grandmother: | Mm-hmm. |
| Father's Counsel: | Okay. So, prior to this petition, the [Child and his sisters] weren't living with you – I'm sorry – [the Child] was not living with you and neither was [Mother]. |
| Maternal Grandmother: | [The Child] was not with me full-time but he was there a lot. |

*Id.* at 188.

Maternal Grandfather also acknowledged that, from 2015 to 2020, Mother was living not with them, but with Stepfather and the Child, in the trailer-home. *See* N.T., 8/3/21, at 57. The Child also considered the trailer-home to be separate from his Maternal Grandparents' home. During his *in camera* interview, the Child explained that he lived with his Maternal Grandparents between 2010 and 2015, but that he lived with Mother and Stepfather in the trailer-home from 2015-2020. *See* N.T., 5/14/21, at 127. Stepfather also indicated that the trailer-home and the house were separate residences. *See* N.T., 8/3/21, at 91-92.

These excerpts evince more than a mere semantical difference between the single-family home and the trailer-home. They demonstrate that Mother and the Child lived as a separate unit from Maternal Grandparents. They were

family, and they were neighbors, but they did not reside together. In reaching this conclusion, we do not overlook Maternal Grandmother's uncontested testimony that she was a part of the Child's daily life. The relationship between Maternal Grandparents and the Child was probably closer than that of most grandparents and grandchildren, and part of the reason for that bond was their proximity. Maternal Grandmother assumed some of the parental duties and did so with considerable frequency. However, Section 5324(3)(iii)(C) does not ask whether the grandparent has assumed the responsibility of raising the grandchild. That question is covered by Subsection 5324(3)(ii), and there is no doubt that the Maternal Grandparents satisfied that element. But the issue here is whether they lived together. For the purposes of the statute, upon review of the record, we conclude that the Child has not resided with the Maternal Grandparents since 2015.

Thus, Maternal Grandparents' action for custody was not filed within six months of the removal, but closer to sixty months. Not only was the July 2020 action for partial custody insufficient to toll the six-month filing deadline for primary/legal custody, but even if it were sufficient, we would still conclude that the July 2020 action was untimely, because the Child has not resided with the Maternal Grandparents since approximately 2015.

For these reasons, we must conclude that the trial court erred when it determined that Maternal Grandparents had standing to obtain primary physical custody and legal custody under Section 5324(3). Given our

disposition, we do not address Paternal Grandmother's other appellate issues, including whether the award was in the best interests of the Child.

Before concluding our discussion, we would be remiss if we did not note our ardent disapproval of how this proceeding was conducted. The delays in this case have been unconscionable. Pennsylvania Rule of Procedure 1915.4 provides for the prompt disposition of custody cases. Under Rule 1915.4(c), the hearing shall commence within 90 days of the scheduling order, and the hearings shall be heard on consecutive days or concluded no later than 45 days from the commencement. Under subsection (d), the court shall issue a decision within 15 days after the matter is concluded – or 45 days, if there is a need for an extension. We understand that special relief can be granted under subsection (e), but it seems nearly every time-constraint enumerated in Rule 1915.4 was ignored. Our ire toward these delays is tempered only by our recognition of the COVID-19 judicial emergency, the prior judge's solemn decision to recuse, and the wisdom to know that no certified record reveals the entire story.

Equally disappointing, the threshold question of standing was largely an afterthought. Much of this litigation could have been avoided. From what we can discern, the only time the court really considered standing was in its final memorandum opinion, wherein the court conceded, after two years of litigation, that Maternal Grandparents were untimely. Despite having knowledge of this dispositive fact since the beginning of the case, the trial

court inexplicably did not grant the repeated requests made by Father or Paternal Grandmother to reconsider its standing decision.

The result has been a complete waste of judicial resources, and it has come at a steep cost to everyone involved; not only the financial cost, but also the cost of placing testimony in the record against the Child's other relatives, which will not be forgotten for some time. Worse yet, these proceedings have had taken a devastating toll on the Child, who had to endure yearslong, acrimonious litigation immediately after losing his Mother under heart-wrenching circumstances. Even if we reached the merits of the trial court's substantive custody analysis, any decision would be moot because of the delay. Regardless of whether we remanded for further proceedings or affirmed the custody order, the case would immediately be ripe for modification due to the change in circumstances from when the case began to when it ended.

In reaching our disposition, we emphasize that the standing inquiry is a legal question independent of the best-interests considerations. *See In Interest of M.R.F., III*, 182 A.3d 1050, 1057 (Pa. Super. 2018). We recognize that Maternal Grandparents still have standing for partial physical custody under 23 Pa.C.S.A. § 5325(1), due to Mother's death. Upon remand, we direct the trial court to consider whether it would be in the Child's best interests to award Maternal Grandparents partial physical custody. *See* 23 Pa.C.S.A. § 5328(a) (relating to best interest factors); (c) (relating to grandparent considerations). We are loathe to order further proceedings but

recognize the same might be necessary. Grandparents know what is best for the Child. We remind them of the caustic effects that prolonged custody litigation and family infighting have on everyone, and we urge them to work together moving forward.

Order vacated. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judge Murray joins.

Judge Bowes files a dissenting memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

FILED: 4/26/2024